UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Michael R Hansen and            Case No. 15-28166-beh
    Mary Beth Hansen,

              Debtors.            Chapter 7

Raymond L. Holden et al.,

              Plaintiffs,

    v.                         Adversary No. 15-2485

Michael R Hansen et al.,

              Defendants.

## MEMORANDUM DECISION

The court held a trial on two matters: (1) Raymond Holden and Talon Executive Search Group LLC's ("Talon") complaint which seeks a determination that alleged debts owed to them by the debtor-defendants Michael and Mary Beth Hansen are non-dischargeable under various theories under 11 U.S.C. sections 523(a)(4) and (6); and (2) the Hansens' objections to the proofs of claim filed by Holden and Talon on the basis that the claimants have no right to payment.

Prior to trial there was no determination of liability for a debt in state court[1], so the court first must determine if the Hansens are indebted to Holden and/or Talon under some claim(s) colorable under state law. If the Hansens are indebted to Holden and/or Talon, the court must then determine whether that

---

[1] In August 2014, the Hansens sued Holden, Talon, and Eagle Technologies (another company owned by Holden) in state court, alleging that Hansen, as a creditor and shareholder of Eagle, was owed money for his interest in the company. Talon and Holden did not assert counterclaims in that case. Milwaukee County Circuit Court Case No. 13-CV-8661. Ex. 49.

indebtedness is non-dischargeable under the theories set forth by Holden and Talon.

For the reasons explained below, the court concludes that Holden and Talon have failed to establish the existence of a debt under their proposed state law theories of liability. Because the plaintiffs have failed to establish the existence of a debt—or a claim—the court need not reach the issue of whether the nonexistent debt is dischargeable.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. section 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. section 157(a). The determination of whether a debt is dischargeable is a core proceeding under 28 U.S.C. section 157(b)(2)(I). Both parties have consented to the court finally adjudicating the existence of a debt under state law, for purposes of both the adversary proceeding and the Hansens' claim objections. *See* Adversary No. 15-2485, CM-ECF, Doc. No. 16 at 1; CM-ECF, Doc. No. 17 at 1; CM-ECF, Doc. No. 25. Thus, the court may issue a final order determining both the existence of any debts under state law, and whether any such debts are dischargeable. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1944–48 (2015) (bankruptcy court can finally adjudicate *Stern* claims with the knowing and voluntary consent of the parties).

## PROCEDURAL BACKGROUND

Raymond Holden is the former CEO of Talon, and Michael Hansen is Talon's former accountant and secretary/treasurer. Holden and Talon each filed proofs of claim in the Hansens' bankruptcy case. In Proof of Claim 1, Holden alleges that the Hansens owe him $256,683.60. Of that amount, Holden claims that $156,683.60 is attributable to Michael Hansen's diversion of company funds (for purposes other than paying taxes), which resulted in Holden becoming personally liable for Talon's withholding and trust fund taxes. The other $100,000, Holden claims, is attributable to misrepresentations that

Michael Hansen made about Talon's financial health, which caused Holden to personally guarantee a $100,000 line of credit at Town Bank.

In Proof of Claim 2, Talon alleges that the Hansens owe the company $173,708.04, which represents: (1) $21,505 in erroneously paid wages and $10,575.57 in health insurance contributions for Mary Beth Hansen; (2) $56,500 in unauthorized salary increases to Michael Hansen; and (3) $85,128.04 in unauthorized expense reimbursements to Michael Hansen.

Holden and Talon also filed an adversary proceeding claiming that these debts are not dischargeable under 11 U.S.C. sections 523(a)(4) and (a)(6), because the debts were derived from larceny, embezzlement and defalcation, and were incurred willfully and maliciously. Neither the proofs of claim nor the adversary complaint allege any particular state law claims that would form the basis of the alleged debts owed to Holden and Talon. The Hansens objected to Holden and Talon's proofs of claim, denying that they owe any debt to Holden or Talon. With the parties' consent, the court consolidated the adversary proceeding and the claim objections for trial.

The combined trial took place over the course of two days, with five witnesses and 39 exhibits received in evidence. At the start of trial, the court asked the plaintiffs what state law claims they would be asserting. Counsel stated breach of fiduciary duty and fraud. At no point during the evidentiary proceeding, including in opening and closing statements, did plaintiffs' counsel outline the elements of those two state law claims. Instead counsel focused on the elements of nondischargeability provisions under the Bankruptcy Code.

At the close of the trial, defense counsel moved for dismissal, contending that the elements of breach of fiduciary duty and fraud had not been met, and no debt established. Alternatively, counsel asserted that even if liability for a debt under a state law theory had been established, plaintiffs had not met their burden to prove that the debt(s) were of a nondischargeable nature. The court declined to rule from the bench on the motion to dismiss, considering that the parties would be better served by written findings of fact and conclusions of law. Those findings are set out below.

**FINDINGS OF FACT**

The primary dispute concerns the degree to which Raymond Holden was aware of Talon business activities over a two-year-plus span when Holden also suffered from serious illness. Those activities included the employment of Mary Beth Hansen, raises given to Michael Hansen, whether money contributed by Michael Hansen to plaintiff Talon were loans that were properly repaid to him, and the status of the Town Bank line of credit and unpaid taxes. Plaintiffs offered no medical testimony as to Mr. Holden's ability or inability to work during the relevant time periods or concerning any impairment as to his memory or ability to understand financial information, either then or at the present time. Mr. Holden's level of involvement in Talon business was disputed.

Plaintiffs called defendant Mary Beth Hansen adversely and plaintiff Raymond Holden. Defendants called Raymond Holden adversely, Philip Spearo, Ryan Kalman (both former employees of Talon and Eagle), and defendants Michael and Mary Beth Hansen. Plaintiffs did not put on rebuttal testimony.

**A. Raymond Holden and the Start-up of Talon**

1.  Raymond Holden considered himself an entrepreneur. He had worked as an independent contractor engineer. He saw how temporary-help businesses operated, and later started his own contractor-direct and headhunter businesses.

2.  Holden operated Eagle Technologies from 1993 to 2011.

3.  In 2010, Raymond Holden saw a new market and created Talon Executive Search Group, LLC. Talon placed permanent employees in skilled trades with client employers.

4.  Holden's plan was to grow Talon into a regional and then national business. Talon was housed in the same building as Eagle, on the lower level.

5.  Holden was Talon's sole owner. He was president and CEO.

**B. Raymond Holden's Operation and Sale of Eagle Technologies**

6.  Holden had opened Eagle Technologies in 1993, and according to Holden, the company had hundreds of employees over the years. Eagle

provided temporary help, primarily welders and machinists, to client companies. Eagle's main expenses were worker compensation and unemployment compensation for the employees it placed.

7.      Raymond Holden was president of Eagle and, for most of its history, its sole shareholder.

8.      Michael Hansen obtained his associate degree in accounting from Milwaukee Area Technical College, and later obtained his bachelor's degree from Spencerian Business College.  He is not a CPA.

9.      Michael Hansen worked as an accountant or bookkeeper for 30 to 35 years before joining Eagle in 2003.  Hansen served Eagle as Vice President of Finance.  He also served on Eagle's corporate board as secretary-treasurer.

10.      Holden described Hansen's duties at Eagle as accountant or controller work, processing accounts receivables and accounts payable, and managing employee personnel folders.  Eagle paid Hansen $60,000 annually. As of April 2010, he was paid $2,000 bi-weekly.

11.      In 2005, Holden offered Michael Hansen and a few other key employees the opportunity to buy shares in Eagle.  Hansen bought a five-percent stake in the company, which after a stock split became seven percent.

12.      In 2008, Securant Bank wanted all shareholders of Eagle to guarantee the company's credit line with Securant.  Hansen decided against doing that, so he sold his Eagle stock back to Holden, and Holden gave him a promissory note for the amount.  There is a dispute as to whether Hansen ever returned his stock certificate.  Holden did not make payments on the promissory note.

13.      Holden testified that, at some point in time, Eagle had approximately $12 million in annual sales.

14.      Eagle sold its assets to The Reserves Network (TRN) on August 28, 2011 for $1.5 million.  $700,000 was paid at the time of sale.  Much of that payment went toward paying down Eagle's line of credit with Securant Bank. The balance from TRN was to be paid in quarterly increments, contingent upon future sales.

15.      Holden testified that approximately $400,000 of the balance was not paid because sales were not achieved.

16.      As a shareholder of Eagle, Holden received the cash payments from TRN.  Holden used some of the sale proceeds to pay withholding and other taxes that had not been paid.

17.     Holden said Hansen was "intimately involved" in the sale of Eagle, helping to arrange the sale with a broker.  Holden also participated in negotiating the asset sale.

## C.     Raymond Holden's Degree of Involvement at Talon

18.     Unfortunately, Holden became seriously ill in 2010, shortly after establishing Talon.

19.     He developed gangrene and required hospitalization, including a period of quarantine.

20.     Between May 2010 and July 2012, Holden had three hospitalizations during which time he was not able to work in the Talon office.

21.     Holden also had a number of outpatient procedures during those two years, continuing through at least September 2012. *See* Ex. 14 (a September 6, 2012, email from Hansen to the broker for the TRN/Eagle transaction, noting that Holden "had to go back into the hospital" and was not able to come into work regularly, maybe once a week for a few hours).

22.     Raymond Holden had surgery in May 2010 for kidney cancer, with resulting complications.  He required extensive pain medication.  Holden's primary health problem between 2010 and 2012 was addressing the gangrene.

23.     Holden testified that his illnesses have affected his memory, and cause some day-to-day confusion.  He testified that he had a hard time concentrating, but the condition is "not as bad now."

24.     One email, dated July 6, 2012, between Hansen and Talon's legal counsel, noted that Holden had been forgetful about raises he approved.  Ex. 11, Ex. 107.

25.     No medical evidence was submitted regarding the number or length of Holden's hospitalizations or days absent from work.  No medical evidence was submitted regarding Holden's ability or inability to concentrate, or retain memory, or make decisions.

26.     The testimony conflicted between Holden's description of minimal time in the office between 2010 and 2012, and non-party employees' testimony of his participation.  Holden did not testify in rebuttal after Hansen, Spearo and Kalman testified.

27.     Since April 2010, Holden testified he has been "pretty inactive" and his balance has been affected; he claimed that, when visiting Talon's office, he became tired after 60 to 90 minutes.

28.     Holden testified that after April 2010 he hardly came to the office of either Eagle or Talon, but "was concentrating on staying alive." He said that by January 2011 he was not in good health, suffering from an open fistula.

29.     Holden estimated he went to the Talon/Eagle offices between six to twelve times between April 2010 and September 2012. He testified that "some months I didn't come in at all."

30.     Hansen agreed that Holden was very sick in 2010. Hansen testified that Holden was in the office 75% of the time most weeks, and that when Holden was not in the office he was available by telephone. Alternatively, Hansen would go to Peggy Holden's home—where Holden was recuperating—to obtain Holden's signature on business documents.

31.     Phillip Spearo's observations corroborated Holden's frequent visits to the office. Hansen said that in the Spring of 2010, Spearo was in charge of the overall corporation.

32.     Spearo recalls that Holden was hospitalized three times between 2010 and 2012, with one hospitalization lasting a month. Specifically, he recalls Holden being hospitalized in the Fall of 2010, sometime in 2011, and approximately June 2012.

33.     Aside from the hospitalizations, Spearo said Holden would come to the office every day, from approximately 9:00 a.m. to 1:00 p.m.

34.     Ryan Kalman's testimony is similar: Holden returned from a major hospitalization in late 2010, and then was hospitalized two or three more times. Overall, Kalman testified Holden was in the Talon office "90% of the time."

35.     Relying primarily on the testimony of non-party witnesses Spearo and Kalman, and indirectly on the fact that Holden did not call Peggy Holden, with whom he lived, to testify as to the amount of time he stayed away from the office, the court finds that Holden was in the Talon office, or available for business consultation and document review at home, 75% of each work week when he was not in the hospital.

## D.     Raymond Holden's Access to Talon Financial Records

36.     Holden agreed he saw the monthly financial reports for Talon, although he said he looked at only "the bottom line." Those reports are contained in Exhibit 104.

37.     Holden said he probably discussed Talon's monthly profit and loss statements with Hansen, as that is what he did at Eagle.

38.     Exhibit 104 contains copies of monthly balance sheets, income statements, general ledger entries, journal entries, and accounts receivable and accounts payable status sheets for Talon, from May 2010 through December 2012 (although the July 2011 reports appear to be missing).

39.     Hansen said he kept all the back-up for the monthly reports in Exhibit 104 in folders, and shared the reports with Holden, Spearo and sometimes others.

40.     Holden received his compensation from Talon via draws.  Ex. 104.

41.     Holden was not sure about the amounts he received from Talon. When shown specific balance sheets reflecting Talon payments to him of $24,000 in 2011, and an owner's draw as of December 31, 2012 of $58,000, he did not dispute those amounts but stated he didn't remember being paid them.

42.     There was no evidence that Raymond Holden had ever asked for particular financial information of Talon and had been refused.

43.     The court finds that Holden, as an experienced business owner, either kept track of the financial status of Talon, or chose not to do so. Notwithstanding the distraction of his serious illness, Holden displayed a cavalier attitude with regard to monitoring Talon's business activities and profit and loss status on a regular basis.  To the extent that Holden claims he relied on any statements inconsistent with the information contained in Exhibit 104, such reliance was not justified.  Also supporting this finding are findings 62, 82, 92, 101, 117, 172, and 176.

**E.     Michael Hansen's Role at Eagle and Talon**

44.     Michael Hansen began work for Talon when it started up in April, 2010.  Hansen took care of all the financial work for Talon, including the accounts payable and payroll.

45.     Hansen had been Vice President of Finance for Eagle since 2003. He began doing accounting work for Talon as well when it opened.

46.     Until litigation arose, Holden and Hansen considered themselves friends.

47.     Hansen had greater responsibilities at Eagle at least initially; at Talon's inception there was less accounting work to do in part because Talon did not pay unemployment compensation or worker compensation for employees it placed.

48.     Hansen was paid $2,000 bi-weekly at Eagle.  Around August 2010, as he began to do more work for Talon, Hansen and Holden agreed that

Hansen ought to take a $300 pay cut at Eagle, and be paid $300 bi-weekly by Talon, with the other $1,700 bi-weekly coming from Eagle.

49.    As Talon was getting started, Holden spoke to an outside CPA about reasonable pay for someone to perform the accounting duties for Talon. He testified that the CPA told him $500 per month would be reasonable.

50.    Hansen testified he became the accountant and secretary/treasurer for Talon. His duties there were the same as he had at Eagle. In contrast, Holden testified that Hansen's workload at Talon did not change.

51.    As an officer of Talon, the court finds that Hansen owed a fiduciary duty to the company and its shareholder.

52.    As one of the company executives, the court finds that Hansen had discretion to use his business judgment to serve Talon's interests.

53.    Hansen said the daily work at Talon included accounts payable, accounts receivable, a lot of meetings regarding customers and number of placements, and how to get more placements and better customers. The executive level meetings were held at least once per month, aside from the other daily meetings.

54.    Hansen estimated there were four times as many internal meetings at Talon as at Eagle.

55.    Hansen held positions at both Eagle and Talon until Eagle was sold in August 2011. After that he worked only for Talon. Hansen understood that Holden relied on him to monitor Talon company finances.

56.    Holden allowed Hansen to use his signature stamp for Talon business.

57.    Holden said that Hansen was easy to work with, his work product was pretty accurate, and he informed Holden on everything.

58.    Spearo testified he saw Michael Hansen at work at Talon every day.

59.    Holden, as owner, was responsible for hiring and firing employees and for determining their compensation. Holden verbally authorized wage increases for employees.

60.    Exhibits 11, 107 and 24 reflect that one employee, Shane Fuller, received three raises between May 2011 and July 2012.

61.    Spearo also received several raises while at Talon, which Holden approved. Spearo recalled Holden calling him into his office, saying, "Congrats,

keep up the good work," and then Spearo would see a raise on his next paycheck.

62.     Kalman testified that he received one raise during his tenure at Talon, and that Holden authorized the raise informally.  He explained that he had just made $80,000 to $90,000 in placements, so Holden called him into Spearo's office, "and that's where I got a pay raise."  Kalman did not believe the raise was ever memorialized in writing.

63.     When he authorized wage increases, Holden did not review any financial reports to see if the increases were affordable.  Holden said he relied on whatever Spearo and Hansen told him.

64.     Hansen testified that in meetings he had told Holden they were hiring too many people, but Holden's response was, "If we don't hire, we won't get sales."

65.     In September 2011, after Eagle had been sold, Hansen received a pay increase at Talon from $300 bi-weekly to $2,000 bi-weekly.  Ex. 7, Ex. 121.  Holden and Hansen dispute whether Holden verbally approved this increase.

66.     Hansen was laid off for a week in December 2011, for holiday purposes.  He and Holden discussed this.  Hansen was paid $1,000 that pay period.

67.     Hansen had similar lay-off periods at other points in 2011 and in 2012, which he says he and Holden discussed.

68.     In February 2012, Michael Hansen received another salary increase at Talon, from $2,000 to $2,200 bi-weekly.  Ex. 7, Ex. 121.  Hansen says Holden verbally approved this increase, but Holden disputes that.

69.     In April 2012, Hansen completed an employment verification form, as he and Mary Beth were refinancing their home.  He listed $2,200 as his bi-weekly salary.  Ex. 136.  Holden admitted his signature appears on this verification.

70.     On May 25, 2012, Hansen's salary increased to $2,400 bi-weekly at Talon.  Ex. 7.  Hansen testified that Holden verbally approved the February and May raises.

71.     Holden, in contrast, testified he never would have approved these salary increases, because of what the outside CPA told him.

72.     Hansen said every increase, bonus or commission he received, as shown on Exhibit 121, was verbally approved by Holden.

73.     Hansen testified that Holden received print-outs showing all employees' wages.

74.     In the summer of 2012, Hansen's hours were cut back to 30 hours per week, and then cut again later that year.  Hansen would be laid off one week, then back at work the next.  Exhibit 121 reflects his decrease in pay from $2,000 to $1,000 bi-weekly.

75.     There was no evidence that Hansen received more than $2,000 bi-weekly from both Eagle and Talon combined during the period when the companies were both in existence.

76.     By the end of 2012, Holden asked Hansen to come in 3 to 4 hours per week if the other staff needed help.  Hansen did so through early May 2013, without reimbursement.

77.     The court finds that Holden had a pattern of verbally approving raises for Talon employees.  Not only Hansen, but Spearo and Kalman attested to this practice.

78.     The court finds that Holden approved Hansen receiving his prior full salary of $2,000 bi-weekly from Talon, once the assets of Eagle were sold. Hansen appears to have devoted substantial efforts to the company (*e.g.*, financial reporting, frequent top management meetings, and regular provision of company expense funds, *see also* findings 39, 90, 93–94, 106, 139, 149–52, 177, and 180–81), with the burden being somewhat greater at times when Holden's illness required him to be out of the office.

79.     Given Holden's pattern of granting raises, without even looking at recent profit and loss statements, it would be inconsistent for him to insist on paying Hansen only $300 or $500 bi-weekly for his work at Talon once Eagle was sold.  While Holden maintained his denial that he authorized Hansen's pay rate at Talon, Holden also testified that Hansen "informed him on everything," and that he relied on Hansen to monitor company finances.  There is no evidence Holden balked after signing Hansen's employment verification in April 2012, which reflected Hansen's $2,200 bi-weekly salary.  Moreover, Holden knew Hansen had loaned the company $25,000 at Holden's request, in Mach 2012.  It is not credible that Holden would have expected a loan like that, on a $300 bi-weekly salary.

80.     There is less evidence to support Holden's approval of Hansen's pay increase to $2,400 bi-weekly, but the preponderance of the evidence supports a finding that Holden did approve the increase, as he had access to company records, his pattern was to give verbal approval, he gave other employees seemingly frequent raises, *i.e.*, see testimony regarding three raises

for Shane Fuller, and Holden regarded Hansen as a friend.  The same evidence supports approval of the bonus and commission paid Hansen.

81.     The court finds that Holden's business approach was to keep his employees happy by giving them raises, in hopes that the company's revenues would improve.

**F.     Talon Business Operation**

82.     Talon had only two or three employees when it began operations in 2010, and 17 employees at its maximum.  The number fluctuated.  Many of Talon's key employees had worked with Holden previously as employees of Eagle.

83.     No written business plan for Talon was offered into evidence or discussed, other than Holden's testimony he desired to grow the business into a regional or national one.

84.     There was no direct evidence of start-up funds provided by Holden to operate Talon.

85.     There was evidence that Michael Hansen provided a $10,000 loan to the company in May 2010 so that it had cash in the company checking account.

86.     Spearo joined Eagle in early 2009, and in the spring of 2010 began working for Talon as the vice president of operations.  He served until June, 2012.

87.     Spearo led recruiting, leadership and executive meetings, which were held weekly if Raymond Holden was healthy.  These meetings were not scheduled in advance, but seemed to be dependent upon Holden coming up with a new idea.

88.     Ryan Kalman worked for Ray Holden at Eagle between 2003 and 2009.  Kalman worked for Talon between 2010 and 2012.

89.     Kalman began as a recruiter of tradesmen, then became recruiting manager, and sales account manager.  He started at Talon right after Holden returned from an illness.  He tried to keep placement numbers up and trained other recruiters.

90.     At executive level meetings, participants would review new clients, growth of the business and financial statements. Holden, Spearo, Kalman, Patrick Bauer and Michael Hansen attended these executive meetings.

91.     Spearo also made hiring and firing recommendations to Holden. According to Spearo, Holden was always involved in the decision-making at Talon, unless he was sick.

92.     Holden did not review any expense reports for Talon, even though Talon picked up the expenses for candidates to fly to interview appointments. On occasion Talon employees would call Holden to obtain expense authorization, and he said that would be followed with a written voucher.

93.     Sometimes the executive meetings were held on a daily basis, to discuss candidate placements and the financial state of the company. Although Kalman did not see financial statements, Holden and Hansen would relay the financial information. They discussed raising fees for placement of welders, and that expenses were rising.

94.     If Holden was not in the office and a decision was needed, they would have phone meetings with Holden from Hansen's office.

95.     Holden described Talon as having sparse sales.

96.     Exhibit 111 includes Holden's tax returns for 2010, 2011 and 2012.  2010 shows a business loss of $64,000.  2011 shows a business loss of $164,000. 2012 shows a business income loss of $290,615. Talon was Holden's only business interest in 2012.  Holden signed these tax returns.

97.     Spearo recognized that Talon was often in the red financially, though not every month.  He saw the financial statements each month.

98.     Spearo and Kalman knew from their meetings that Talon was not making money. Spearo prepared the sales spreadsheets.

99.     Spearo recognized that Talon was a start-up, and said that Holden told him it was unrealistic to make a lot of money initially.

100.   Exhibits 128 and 129 reflect a first shareholders meeting of Talon on April 23, 2011, held at the office in West Allis.  The documents are signed or stamped by Raymond Holden.  Holden said other shareholder meetings were held at a restaurant.

101.   Holden testified he was "not concerned with job responsibilities," but that whenever he was at the office he tried to run sales meetings and oversee hiring.

102.   He knew there were "up and down months" and that Talon wasn't "skyrocketing" financially, but asserts that he was not aware of the company's severe financial difficulties until September 2012.

103.  On September 17, 2012, Hansen discussed with Holden that Talon was not doing well financially. Holden testified that, at his request, Hansen sent Talon's corporate lawyer an email regarding cash flow difficulties, and asked about closing the company.

104.  Holden testified that this September 17, 2012 discussion is when he first learned that Talon was not profitable.

105.  Holden testified that Michael Hansen and Spearo told him the company was getting clients, and that sales were looking up, at least as of January, 2012.

106.  In contrast, Hansen testified that he gave Holden hard copies of monthly financial statements.  Hansen saw Holden review them.  Holden was privy to all of the payroll information, as Hansen testified.  The financial health of Talon was the subject of on-going discussion between Holden and Hansen.

107.  Spearo said Holden would see the candidate travel expenses, for example, on the monthly financial statements at executive meetings.

108.  By October, 2012, Talon was down to six or seven employees, according to Hansen.

109.  The court finds not credible Holden's testimony that he never saw the monthly financial statements compiled in Exhibit 104.  That testimony contradicts his later statements that he probably received monthly financial statements but would—by his choice—review only the bottom line, and also that he probably discussed them with Hansen.

110.  Also supporting this finding is testimony from Hansen, Spearo and Kalman that they were in meetings with Holden where those documents were discussed, and certainly where the company's overall financial status and sales spreadsheets were discussed.  All three of those employees testified they knew the company was losing money, even though some months there was a profit.

111.  Even if the court were to accept Holden's testimony that he did not see these monthly reports, he had every opportunity to see them or ask Hansen, Spearo or Kalman about them, his illness notwithstanding.  Holden's experience running Eagle for 18 years certainly familiarized him with the type of monthly reporting done by a company of Talon's size.  Holden never testified that he had asked for monthly reports but was refused.  Holden's 2010 through 2012 tax returns, which he signed, showed steady losses at Talon.

112.  The court finds that Holden was aware that Talon was not profitable before September 2012.  That date may well be the point at which Holden began to come to grips with the situation, but his own testimony that

he "probably saw the monthly profit and loss statements," although he only "looked at the bottom line," as well as the fact that he signed his own tax returns which showed successive business losses from 2010 through 2012, inescapably lead to the conclusion that Holden was aware, or chose not to be aware, of Talon's financial circumstances. His testimony that he didn't look at the financial statements before deciding to verbally approve an employee raise undercuts any argument that his reliance on Hansen's alleged statements about the company's financial health or details were justifiable.

113. Additional evidence supporting the finding that Holden was aware that Talon was losing money were his requests to employees to loan the company money, and his statements to Kalman that the company's Town Bank line of credit was "almost maxed out" and that the balance on Hansen's credit card, which he used for company expenses, was pretty high. Holden did not refute Kalman's testimony.

114. Additionally, around July 2012, Holden directed that Mary Beth Hansen be terminated, and other employees were also let go around that same time.

115. Although no medical testimony was offered, it may be that some of Holden's testimony in 2016 about a lack of knowledge of Talon financial affairs, or of Hansen's pay rate, actually reflects some memory or concentration impairment. Without admissible expert evidence, it is impossible for the court to find that Holden suffered from such impairment during 2010 through 2012, particularly when non-party employees testified he "was in charge." *See* findings 91 and 147.

## G. Employment of Peggy Holden and Mary Beth Hansen

116. Peggy Holden is Raymond Holden's ex-wife. After he became ill, Raymond moved back into Peggy's house.

117. Peggy Holden was nominally on the board of Talon. There is no evidence she attended a board meeting or performed compensable work for the company.

118. Holden testified that Peggy was on the board "to make sure things went my way." He could not say how many Talon board of director meetings were held. Board meeting minutes were never amended to reflect that Peggy was a board member.

119. Holden said Peggy's role also was to sign checks when he was unavailable, but he cannot think of any company checks she signed.

120. Peggy Holden had a full-time job elsewhere.

121.   Raymond Holden approved paying Peggy $935 bi-weekly as a Talon employee, so that she would have health insurance coverage.

122.   Peggy Holden did not testify.

123.   Mary Beth Hansen is married to Michael Hansen.  She did clerical work, at home, for Eagle and later for Talon.

124.   Michael Hansen brought home vendor files and invoices for her to organize, as well as checks to alphabetize, employee file folder labels to make and envelopes to stuff and stamp.

125.   Eagle paid Mary Beth Hansen $935 bi-weekly for that clerical work.  Michael Hansen testified that he and Holden came up with that amount, so that her total pay would equal at least 35 hours per week at minimum wage in order to obtain health insurance.

126.   Eagle's payroll records were not introduced into evidence.

127.   From approximately September 2011 to July 2012, Mary Beth Hansen performed similar clerical work for Talon, at the same bi-weekly pay rate.  She performed this work at her home, not at the Talon office, for 5 to 10 hours per week, though she may not have worked every week during that period.  She worked more at year end.  Ex. 9, Ex. 122.

128.   Mary Beth Hansen never had direct contact with Raymond Holden regarding her employment with either Eagle or Talon.  Mrs. Hansen understood that she was given work for Talon so that she and her husband would not have to pay COBRA premiums for health insurance.

129.   She testified that she thanked Holden once "for putting me on" and that he responded, "I'm glad I could do it for you."  Holden denied this conversation occurred.

130.   In April 2012, Michael Hansen completed an employment verification form for Mrs. Hansen, and listed Mary Beth's salary as $24,310 annually, consistent with $935 bi-weekly.  Ex. 137.  Holden admitted his signature appears on the verification.

131.   Holden directed that Mary Beth Hansen be terminated in approximately July 2012.

132.   Ryan Kalman, an employee of Eagle and then of Talon, testified that Ray Holden told him that Mary Beth Hansen worked for Eagle and then was carried on to the Talon payroll.  In late 2011 or thereafter Holden mentioned to Kalman that he needed to get Mary Beth off the payroll to save expenses, but was worried about losing Michael Hansen's friendship.

133.   Other employees were let go around the same time as Mrs. Hansen.

134.   Mary Beth Hansen then filed for unemployment compensation, which she received for approximately 10 months.  Ex. 22.

135.   The court finds that Holden had access to Talon payroll information between 2010 and 2012.

136.   The court finds that Raymond Holden was aware of Mary Beth Hansen's employment with Talon, which was similar to the arrangement made for Peggy Holden, and was a continuation of her status at Eagle.

137.   The court finds that Raymond Holden approved Mary Beth Hansen's employment by Talon until he terminated her in July 2012.  The symmetry of the arrangements for Peggy Holden and for Mary Beth Hansen, plus the corroboration by non-party Kalman, lend support to these findings.

138.   The court also finds that Raymond Holden was aware of Mary Beth Hansen's receipt of unemployment compensation benefits after he terminated her from Talon.  All of the company financial statements, general ledgers and journal entries were available to Holden, as contained in Exhibit 104.

## H.   Use of Michael Hansen's Personal Credit Card for Talon Expenses

139.   Talon never had a corporate credit card.  Instead, Holden knew that Michael Hansen, through Shane Fuller, put many company expenses on his personal credit card.

140.   Holden said he never thought about getting a company credit card.

141.   Holden knew employees put company expenses on their personal credits cards, but testified they should not expect to be reimbursed unless he had given prior approval.

142.   Holden testified the same rationale would apply if Michael Hansen made a personal loan to Talon.  He would just be another creditor of Talon.

143.   There was no evidence that Holden told Hansen to stop using his personal credit card to cover Talon employee travel expenses.  Ex. 103, Ex. 5.

144.   Kalman testified he was unaware of any voucher system at Talon for expense reimbursements. Kalman said Holden and Hansen always talked.

145.   Spearo said Peggy Holden's name was never used in discussion of vouchers for expense reimbursement. Any large-scale approvals (like flying candidates across country) went through Raymond Holden.

146.   Talon's expenses included telephone, internet, office buildout, payroll and recruiting expenses, including candidate travel.  Holden was aware of this framework and would say, "You have to spend money to make money." Holden approved expenses verbally, often at executive meetings.

147.   Holden had a standing order, as Spearo recalled, that expenses related to candidates were approved.  Spearo had no concerns about Holden's competency to act in the business, and perceived that Holden was "very much in charge."

148.   On the rare occasion Holden was not in the office, Spearo would call Holden to approve an expense.  Michael Hansen usually participated in those discussions.

149.   Spearo doesn't recall using his own credit card often for Talon expenses; instead Michael Hansen was in charge of those.  Shane Fuller also used her personal credit card for Talon expenses on occasion.

150.   Hansen put Talon's travel expenses for prospective outsourced employees on his personal credit card.  Hansen believed the only way to get prospective employees out to prospective client sites was to cover their travel expenses.

151.   Holden agreed that the company would reimburse Hansen at the end of each month, once he received his credit card statement.  Exhibit 103 includes Hansen's credit card statements and reflects the Talon reimbursements to Hansen for his credit card expenses.  Hansen said these amounts were recorded on the general ledger.

152.   Kalman testified that Holden told him in late 2011 that "Mike's credit card balance was getting high."

153.   While Holden repeatedly testified that he did not authorize the company expenses Hansen incurred on his personal credit card, he also testified that the company would reimburse Hansen at the end of each month. Holden does not dispute that the expenses were made on behalf of the company.  Kalman's testimony undercut Holden's testimony that a written voucher system was imposed at Talon for reimbursement for company-related expenses.

154.   Holden did not explain an available alternative means for the company to have continued the work it was doing.  His testimony seemed to describe a post-hoc disagreement with the volume of expenses, and essentially a business judgment dispute, rather than a claim of misrepresentation.

## I. Hansen's Loans to Eagle or Talon and Reimbursements

155.    On May 17, 2010, shortly after Talon's start-up, Hansen loaned the company $10,000.  Ex. 123, p.5.  This was because at the time the company checking account was set up, it had no funds for payroll.  According to Hansen, Holden was aware of this loan.

156.    Page 3 of Exhibit 123 reflects a $5,000 short-term loan Hansen made to Talon on December 28, 2011.  Holden did not dispute that he was aware of these two loans shown in Exhibit 123.  Hansen said Holden asked him to lend the money.

157.    In late 2011 or early 2012 at company-wide meetings, Holden asked all the employees to loan money to Talon.  Spearo declined and thinks Michael Hansen was the only employee to loan the company money.

158.    Kalman had invested in Eagle, but declined to do so for Talon.

159.    On March 15, 2012, Hansen loaned Talon $25,000 via a check.  Ex. 123, p.2.  This was around the time Holden had asked all employees to loan the company money.  Kalman said Holden made clear in meetings that Hansen had loaned Talon money, in 2011 or early 2012.

160.    Hansen did not receive a promissory note to evidence this loan; the arrangement was verbal.  Hansen testified that no one spoke of an interest rate on the loan, but verbally discussed that when Talon could pay it back, it would.

161.    Exhibit 4 includes accounts payable vouchers and copies of checks which were loan paybacks to Hansen.  Hansen signed the company checks to himself.  One voucher was dated September 20, 2011 (Bates No. 66), which Holden signed and approved.  Hansen didn't know why Holden signed that voucher, but not others.

162.    Hansen wrote company checks to reimburse himself for loans to Talon when there was money available.  He tried to spread the repayments over time.  Hansen said Holden verbally approved every pay-back.

163.    Hansen testified he was not reimbursed for the full $40,000 in loans he gave Talon.

164.    In addition to asking employees for loans to Talon, Holden sold some old cars to raise cash for the company.

165.    Hansen testified that Holden authorized Eagle to loan money to Talon to cover payroll.  The loans were carried as payables to Eagle.  Ex. 23.  Hansen thinks some of the dates reflected on Exhibit 23 may be wrong—

specifically for two October 2011 loans from Eagle to Talon. The balance owed as of December 31, 2012 was $129,000.

166.    The court finds that Holden was aware of Hansen's $10,000 loan to the company to start its checking account. It may be that Holden didn't learn of that loan until after his hospitalization in May 2010, but as noted amply above, the loans were entered in the company ledger, Holden had access to the monthly statements and other financial records, he and Hansen spoke frequently, and Holden must have known he did not use his own cash to make the initial deposit into the company account.

167.    The court finds that as Holden acknowledged he expected personal credit card expenses would be reimbursed at the end of the month, he expected that the company would repay other forms of employee loans to the company.

168.    The court also finds that Holden was aware of Hansen's $5,000 loan to the company in December, 2011, and, lacking a written promissory note, that it would be repaid at some point.

169.    The court also finds that Holden was aware of Hansen's $25,000 loan in March, 2012. Hansen made this loan directly in response to Holden's request, and Kalman's testimony corroborates this. The loan was recorded on the company financial records. Lacking a written promissory note, as was the company's practice, Holden would have expected the company to repay the loan at some point.

170.    The court finds that Hansen made loans to Talon to help keep the business afloat. The loans were not documented by promissory notes—an ill-advised practice—but they were reflected on the company's financial statements, and thus available for Holden's review throughout the duration of the company. Ex. 104.

## J.    Failure to Pay Talon Taxes

171.    Holden testified that he did not know Talon had not paid its trust fund taxes and other withholding taxes until November 2012, and that Michael Hansen never mentioned Talon being behind on any payroll taxes or trust fund taxes.

172.    Holden stated that Hansen received all of Talon's tax notices and arranged for the payment of the taxes; according to Holden, Michael Hansen "came to me and told me about these payments [being made], meanwhile I'm getting more and more and more tax notices and levies."

173.    Hansen admitted that he withheld payroll taxes, but stated that he did so at Holden's instruction. Hansen explained that, in late August of 2012,

he told Holden that the company could pay either its taxes or its employees, but not both. Holden's response, according to Hansen, was "no employees, no business."

174. In January 2013, Holden authorized Hansen to discuss the Talon tax situation with the IRS. Ex. 110. Holden and Hansen discussed Holden's personal liability for taxes.

175. The court credits Hansen's testimony and finds that Holden was aware of Hansen's failure to pay taxes prior to November 2012, and that Holden, rather than Hansen, made the ultimate decision to pay wages instead of taxes.

## K. Talon's Line of Credit with Town Bank

176. Exhibits 16 and 134 are minutes of a December 11, 2011 special meeting of Talon shareholders, authorizing a temporary credit line from Town Bank for $100,000. The line was to be secured by a $400,000 note received from the purchase of Eagle. Holden prepared these minutes.

177. Holden said he did not review any financial documents before he consented to authorize the line of credit. He knew Michael Hansen was working with their banker on this, and said he trusted Hansen.

178. Spearo testified that Holden mentioned the company's line of credit many times in company meetings, referring to it as "our safety net."

179. According to Spearo, Holden also cautioned his employees that the company was close to maxing out the line of credit.

180. Hansen testified that he and Holden went together to Town Bank. Holden made projections to show the bankers, provided a general vision of where Talon was going, and signed documents. Hansen presented current financials and participated in the general discussion.

181. Hansen made transfers from the line of credit when needed for payroll or monthly expenses. The balance on the line was reported in the monthly financial statements provided to Holden, whether or not he read them.

182. Town Bank renewed Talon's line of credit in July 2012. Ex. 109.

183. Exhibit 39 shows draws on the Town Bank line of credit. By August, 2012, Talon had fully drawn on the line.

184. The court finds that Hansen did not make any misrepresentation to cause Holden to guarantee the line of credit with Town Bank. Holden actively participated in the application for the line of credit: Holden prepared

the company minutes authorizing initiation of the line, and joined Hansen at a meeting with Town Bank.

185.  Also supporting the finding that Hansen did not make any misrepresentation regarding Holden's guarantee of the line of credit is that Holden had used a line of credit with Securant Bank for Eagle, with a substantial amount owing at the time Eagle's assets were sold. He was fully aware of how such loans operate and when security is required. It appears that Talon's business model required more up-front expenditures than did Eagle's, and a line of credit is a common useful tool in such situations.  The on-going status of the line of credit—withdrawals and repayments—were noted on the company ledger and monthly financial statements, all records available to Holden.  Ex. 104.

## CONCLUSIONS OF LAW

Before the court can determine whether a debt is non-dischargeable, the existence of a debt must be established. A "debt" is "liability on a claim," 11 U.S.C. section 101(12), and a "claim" is, generally speaking, a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment," 11 U.S.C. section 101(5).  The terms "debt" and "claim" are coextensive.  *Penn. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990), *overruled by statute on other grounds as recognized by Johnson v. Home State Bank*, 501 U.S. 78, 83 n.4 (1991).  Consequently, the Hansens' objections to Holden and Talon's proofs of claims, namely, that there is no debt, must necessarily be decided first.

A proof of claim filed in accordance with 11 U.S.C. section 501 is deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  When an objection is filed, it is the judicial function of the court to determine if the objection is well-founded.  *In re Johnson*, 960 F.2d 396, 404 (4th Cir. 1992) ("even though the existence of a claim is controlled by state law, the allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of its equitable powers.").

The burden of proof for claims is a shifting one.  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  The claimant must allege facts in its proof of claim sufficient to support the debtor's legal liability to the claimant.  *Id.*  A

proof of claim that does so, and is executed and filed in accordance with the Bankruptcy Rules, constitutes prima facie evidence of the amount and validity of the claim. Fed. R. Bankr. P. 3001(f). Going forward, the burden shifts to the objecting party to produce evidence in equal force to the prima facie case, which, if believed, would refute the claim's legal sufficiency. *Id.* 173–74. If the objector produces sufficient evidence, then the burden of proof reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *Id.* at 174. The ultimate burden of proof lies with the party who would bear it outside of bankruptcy. *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 21 (2000).

Here, the burden lies with Holden and Talon to prove the existence of a debt by the preponderance of the evidence. Under the shifting paradigm, the Hansens have objected to Holden and Talon's proofs of claim arguing that there is no evidence that the debts exist, which is equally as probative as Holden and Talon's allegations in their claims that the debts do exist under state law. In any event, *Raleigh* directs that Holden and Talon bear the burden of proof because they would bear the burden of proving the existence of the debt in state court.

Plaintiffs argue that their claims arise under two state law causes of action: (1) fraud and (2) breach of fiduciary duty. To establish a claim for fraud based on misrepresentation, the plaintiff must prove the following elements:

(1) the defendant made a factual misrepresentation;

(2) which was untrue;

(3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false;

(4) the defendant made the representation with intent to defraud and to induce another to act upon it; and

(5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Kaloti Enter., Inc. v. Kellogg Sales Co.*, 699 N.W. 2d 205, 211 (Wis. 2005). The plaintiff must also prove that its reliance was justifiable. *Id.* at 215 (citing *Ollerman v. O'Rourke Co.*, 288 N.W.2d 95, 108 (Wis. 1980)).

Intentional misrepresentation can result from a "failure to disclose a material fact" or a "statement of a material fact which is untrue." *Kaloti,* 288 N.W.2d. at 211. To be charged with a failure to disclose, one must first be under a duty to disclose. *Id.* at 211–12. In a business transaction, a party has a duty to disclose a fact where:

(1) the fact is material to the transaction;

(2) the party with knowledge of the fact knows that the other party is about to enter into the transaction under a mistake as to the fact;

(3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and

(4) on account of objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Id.* at 213.

The court finds that Michael Hansen did not make any factual misrepresentations or fail to disclose any material facts to Holden about the transactions at issue. Holden was aware of Talon's failure to pay company taxes, and was in fact responsible for that decision. And Holden knew—or should have known, through a review of the financial information available to him—of Talon's financial health when securing the Town Bank line of credit. Holden was also aware of and approved Mary Beth's Hansen's employment by Talon, her later receipt of unemployment compensation benefits, and Michael Hansen's pay raises. Holden likewise knew (or should have known) of Michael Hansen's repayment of his personal loans to Talon and reimbursement of company expenses charged on his personal credit card.

Setting aside the lack of a misrepresentation, the court also finds that Holden and Talon have failed to establish that Michael Hansen acted with an intent to defraud, and that Holden/Talon justifiably relied on any alleged misrepresentations. As to the former, all the credible evidence was that Hansen

devoted substantial time, effort, and personal resources to help Talon succeed. Non-party employees testified that Hansen repeatedly discussed company financial status with Holden. As to the latter, Holden testified he made the hiring and firing and salary decisions, he saw or chose not to read the financial detail, and he had substantial business experience.

Holden and Talon's claims for breach of fiduciary duty must likewise fail. To establish a Wisconsin state law claim for breach of fiduciary duty, the plaintiff must prove that:

> (1) the defendant owed a fiduciary duty;
>
> (2) the defendant breached that duty; and
>
> (3) that breach of duty caused the plaintiff's damage.

*Yates v. Holt-Smith*, 768 N.W.2d 213, 219 (Wis. Ct. App. 2009). Corporate directors and officers owe a fiduciary duty of good faith and fair dealing in the conduct of a corporate business to both the corporation and its shareholders. *Id.*

Defenses to a claim for breach of fiduciary duty include the business judgment rule. That rule reflects a presumption that a director of a corporation, in making business decisions, acted in good faith and with an honest belief that his or her decisions was in the best interest of the company. Honest errors of judgment in good faith protected; bad faith not protected. *Id.* at 219–20. *See also Reget v. Paige*, 626 N.W.2d 302, 310–11 (Wis. Ct. App. 2001).

As an officer of Talon, Hansen owed a fiduciary duty to the company and its shareholder. But the court concludes that (1) Hansen did not breach that duty, and (2) Holden's and Talon's claimed damages did not result from any alleged breach. As noted above, Holden was aware of Hansen's actions, and in many cases—such as the decision to pay salaries rather than taxes—expressly authorized them. Even if the actions had not been authorized, the court finds that they would be protected by the business judgment rule. There is no evidence that Hansen acted other than with good faith in working for Talon, as

evidenced by his several loans to the company in order to keep it afloat, and continued use of personal credit card for company expenses.

Having concluded that neither Talon nor Holden has established a state law claim for a debt owed by the Hansens to either plaintiff, the court will sustain the objections to Proof of Claim No. 1 and Proof of Claim No. 2. And because Holden and Talon have failed to prove the existence of a debt, they have failed to carry their burden of establishing the existence of a "non-dischargeable" debt, so the relief requested in their adversary complaint must be denied. The court will issue separate orders sustaining the Hansens' claim objections and dismissing the complaint.

Dated: October 24, 2016

By the court,

Beth E. Hanan
United States Bankruptcy Judge